GISMONDI, PAGLIA, SHERLING,
M.D., P.C., Plaintiff,

v.

Michael J. FRANCO, M.D., Defendant.

No. 00 Civ. 3565 CM MDF.

United States District Court,
S.D. New York.

June 22, 2000.

Jack S. Dweck, Richard A. Hubell, The Dweck Law Firm, New York City, for plaintiff.

Mark S. Gregory, Kelley Drye & Warren, Stamford, Connecticut; Jonathan P. Whitcomb, Diserio Martin O'Connor & Castiglioni, Stamford, Connecticut, for defendant.

## DECISION AFTER TRIAL

McMAHON, District Judge.

In this action, Plaintiff Gismondi, Paglia, Sherling, M.D., P.C., (hereinafter "GPS"), a professional medical corporation, sues its former employee, Dr. Michael J. Franco, to enforce the terms of a restrictive covenant contained in Franco's employment contract. The matter was brought on by order to show cause on May 11, 2000. Rather than bother with a preliminary injunction, the Court ordered the parties to proceed to a trial on the merits of Plaintiff's claims (which included a claim on a

note as to which Defendant was allegedly in default). That trial took place on June 12 and 13, 2000. Defendant interposed a number of counterclaims, but discontinued them without prejudice pursuant to Fed. R.Civ.P. 41(c).

The following constitute the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

### (1) Defendant's Employment with GPS

GPS, a New York professional corporation that has conducted business since 1974, is a multi-office general medical practice. Its main office is in Mamaroneck, New York, and GPS has other offices throughout Westchester County. The doctors employed by GPS specialize in the areas of pulmonary medicine, critical care, internal medicine, family practice and sleep medicine. The principal (shareholders) of GPS include Dr. Dante Gismondi, Dr. Joseph Paglia, Dr. Bruce Sherling, and Dr. Bruno DiCosmo. At present, GPS employs seven doctors and approximately 28 staff members.

Michael J. Franco is a doctor licensed to practice in New York, Connecticut, New Hampshire and Vermont. He grew up in Greenwich, Connecticut, left to attend college and medical school, returned for his residency at Stamford Hospital, and then spent three years at Mary Hitchcock Hospital at Dartmouth College, Hanover, New Hampshire, as a fellow in pulmonary and critical care medicine. He is Board-certified in Internal and Pulmonary Medicine. He has several publications to his credit. (PX 8.) He also has training in sleep medicine and is eligible to sit for Board certification in that area, although he has not done so.

When Dr. Franco had a year to go on his fellowship, he began exploring career options in the Fairfield County area where he had grown up. (PX 31.) No evidence has been offered about when Dr. Franco first made contact with Plaintiff, or how. By March 24, 1997, however, he had signed a letter of intent (headed "Proposal") detailing salary, bonuses, and benefits from July 1997 to January 2001. (PX 3.)

Thereafter, Dr. Franco and Dr. Paglia, representing GPS, negotiated the formal employment contract that Dr. Franco was required to sign. Plaintiff and/or its counsel drafted the employment contract.

Apparently, only one contract term resulted in significant negotiations: the restrictive covenant at issue in this case.[1] It went through four iterations. In what has been represented as the first draft of the contract (PX 4), the covenant prevented Dr. Franco from "engaging in the practice of medicine within a ten (10) mile radius of the Town of Mamaroneck, New York, City of New Rochelle, New York, and Greenwich, Connecticut" for a period of three years following the termination of his employment. A draft dated on or about May 20, 1997 prohibited Dr. Franco from engaging in "the practice of medicine in the Town of Mamaroneck, New York, and the Village of Port Chester, New York, and within a ten-mile radius of the said Town of Mamaroneck, New York and the Village of Port Chester, New York." (PX 5.) The next draft changed the ten-mile radius to fifteen miles. (PX 6). Dr. Franco weighed in on May 22, with the suggestion that the covenant restrict him "in the Town of Mamaroneck, New York and the Village of Port Chester, New York, and within a fifteen mile radius from the outside borders of the Town of Mamaroneck, New York and the Village of Port Chester, New York, excluding the State of Connecticut." (PX 33.)

---

1. Dr. Paglia testified that there were negotiations over Plaintiff's salary, and indeed that his salary was set at the level chosen— $130,000 per annum—at least in part due to changes made in the restrictive covenant. However, the letter of intent specified the $130,000 salary level, so that issue was obviously settled well before the scope of the restrictive covenant became contentious.

The last proposal was unacceptable to GPS. Like many medical groups in this era of managed care, GPS envisioned growing its revenues by growing its patient base. It had recently purchased a practice in Rye, New York, to complement its offices in the adjacent municipalities of Mamaroneck and Port Chester (where the practice was affiliated with United Hospital). Dr. DiCosmo testified, credibly, that GPS found Dr. Franco an interesting prospect because he had family ties at Greenwich Hospital ("GH") through a Dr. Michael Marino, a nephew of a friend of Franco's father, and because Franco anticipated obtaining a teaching position and admitting privileges there. GPS hoped to develop its practice in lower Fairfield County, and Dr. Franco was part of that strategy. Therefore, GPS was not willing to employ Dr. Franco if he would not agree to some restrictions on his post-employment ability to practice within Connecticut.

Dr. Franco and Dr. Paglia negotiated over this particular term between May 22 and May 28, 1997. Dr. Franco protested that he could not take the risk that he would have to move his wife and children out of Fairfield County if his relationship with GPS did not work out. Eventually, Dr. Paglia suggested that they carve out the City of Stamford, Connecticut from the scope of the restrictive covenant, and Dr. Franco agreed. The contract that was finally signed (PX 1) contained the following language:

> As a material inducement to the COR-PORATION to enter into this Agreement, EMPLOYEE agrees that, in the event of termination of his employment hereunder, for a period of three (3) years following the termination date, he shall not, directly or indirectly, whether as a sole practitioner, or as an employee, shareholder, director, officer, partner, agent or independent contractor of any person, persons or entity, or in any other capacity:
>
> (i) Engage in the practice of medicine in the Town of Mamaroneck, New York

and the Village of Port Chester, New York, and within a fifteen-mile radius from the outside borders of the Town of Mamaroneck, New York and the Village of Port Chester, New York, except that EMPLOYEE shall not be restricted from practicing medicine in the City of Stamford, Connecticut.

Dr. Franco's contract also contained a liquidated damages clause, which stated that any injury resulting from Dr. Franco's breach of the restrictive covenant was likely to cause GPS irreparable damage, and provided that he would pay GPS a year's salary ($130,000) as liquidated damages in the event of a breach by Franco. (PX 1.)

The contract also contained the following pertinent provisions:

(1) Franco would work full time for the corporation, and would turn over to GPS any money he earned from any business or professional services rendered by him. (PX 1, Section 4.)

(2) Franco was eligible for a bonus in the years 1999 and 2000, calculated as a percentage of any revenues he brought into GPS in excess of $350,000 for those calendar years. The practice's accountant was to determine Franco's eligibility for a bonus and his determination was to be final and binding on the parties. (PX 1, Section 5.)

(3) Franco certified that he was licensed to practice medicine in New York and would remain so licensed. (PX 1, Section 2.)

(4) Franco would not solicit any patients of the practice for three years following his departure from the practice, disclose the names and addresses of GPS's patients, or solicit any GPS employee to come work for him. (PX 1, Section 10(a).)

(5) The contract was to expire at year-end 1997, and would continue from year to year thereafter unless terminated by either party on 60 days' written notice. (PX 1, Section 1.)

(6) The contract could be terminated for cause under the following conditions: "A determination by the CORPORATION that EMPLOYEE has engaged in misconduct or has breached this Agreement in such a material manner as to render continuance as an EMPLOYEE detrimental to the CORPORATION." (PX 1, Section 9(g).)

The contract did not contain any provision requiring Franco to become licensed to practice medicine in Connecticut or to obtain and retain privileges at Greenwich Hospital. It contained no representations of any sort about the future of GPS's practice or its business plans. It said nothing about sleep medicine or Defendant's expertise in that area.

The contract contained a standard merger clause, which precluded reliance on any representations not contained therein and merged and superseded all prior discussions between the parties. (PX 1, Section 12(b).)

At the same time, Dr. Franco borrowed $15,000 from GPS to help finance his move back to Connecticut. He signed a promissory note in that amount on May 20, 1997. (PX 2.) The note provides, in pertinent part, "Upon default in payment of any installment of principal or interest when due, the whole of the principal sum then remaining unpaid and all interest accrued thereon shall, at the option of the Payee, become immediately due and payable, without demand or notice."

Dr. Franco, who had let his Connecticut medical license lapse when he moved to New Hampshire, reobtained the license in 1997. He also applied for privileges at GH on June 9, 1997. (PX 54.) Franco admitted at trial that he obtained his privileges after signing the letter of intent with GPS, and that he used those privileges to further his employment with GPS. Dr. Franco further admitted that he had no practice whatever in Connecticut prior to coming on board at GPS.

Dr. Franco came to work for GPS on August 1, 1997. His assigned duties included spending two hours per day on the teaching faculty at Greenwich Hospital, where he had indeed obtained privileges and a faculty appointment. For performing those services, Dr. Franco was paid the sum of $26,000 per annum, which became the property of GPS under the terms of their agreement. Dr. Franco also saw patients at GPS's offices in Mamaroneck, Rye, White Plains and Yorktown, as well as at Gateway/United Hospital in Port Chester. The last was something of a *pro bono publico* activity on the part of the corporation; physicians from GPS who went to Gateway were not credited for billings, but United Hospital loaned GPS the services of physicians on its staff for an equivalent number of hours.

Dr. Franco was the only physician at GPS who had admitting privileges at GH. Indeed, none of the other doctors in the practice ever applied for such privileges, although at least two doctors in the practice are licensed to practice medicine in Connecticut. Dr. Bruno DiCosmo, who served as GPS's principal witness at the trial, testified that GPS viewed it as part of Dr. Franco's job to help other GPS doctors obtain admitting privileges at GH. Dr. DiCosmo further testified that Franco discouraged other GPS doctors from applying for privileges at GH, on the ground that Connecticut doctors would feel that their New York neighbors were poaching on their territory. Dr. Franco testified that he had no way of obtaining GH privileges for any other doctor. He did not refute Dr. DiCosmo's testimony that he discouraged his colleagues from making application, and he further testified that obtaining privileges at GH is extremely difficult. I am in no position to determine whether Franco had legitimate reasons for discouraging his colleagues from applying for privileges, but I note that he was powerless to stop them from doing so on their own.

The parties' relationship appears to have been satisfactory well into the calendar year 1999. The only fly in the ointment was that Dr. Franco failed to make regular payments on his note. He did make some payments, at a relatively modest and varying rate of between $125/month and $500/month, from November 1997 through December 1998. (PX 11.) However, he was delinquent from the due date of the very first payment. GPS was patient about this, which suggests to me that the practice was satisfied with Dr. Franco's services, at least initially, and wished to accommodate him.

By a later point in 1999, several bothersome issues had surfaced in the relationship between Dr. Franco and GPS. One concerned Dr. Franco's chronic lateness. Dr. Franco admitted on the stand that he was a "late" person, but there is no question that GPS failed to calculate a reasonable amount of travel time for Dr. Franco to travel from GH to whichever office of GPS he had to be in on any particular day. Schedules introduced at trial indicate the Dr. Franco was expected to be at GH from 8 to 10 AM each day, yet to begin seeing patients at 10 AM at GPS.

Another issue was Dr. Franco's lack of interest in "promoting the practice." The principals of GPS, well aware of the exigencies of today's competitive medical environment, made themselves available to attend and sponsor charity functions on behalf of the hospitals at which they were on staff, where they gave lectures and for which they did public service TV and radio spots. Dr. Franco did not participate in these sorts of activities, despite the fact that they promoted good will in the community and led to a physician's becoming known to colleagues who might make referrals to him. He attended one charity function during his employment at GH. This did not sit well with his colleagues.

The third issue was Dr. Franco's entitlement, or lack of entitlement, to a bonus per the billing provisions of his contract. Dr. Franco believed that he should get credit toward his $350,000 in billings for the hours he spent on behalf of the practice at Gateway, where he saw indigent patients for whom GPS did not bill. GPS felt otherwise. It gave no credit to any doctor for hours worked at Gateway (although the shareholders benefitted from the billings generated by the loaned United Hospital physician). GPS took the position that it had compensated Franco for his *pro bono* time by assigning him to work in the Rye office, which was a busy and potentially lucrative office where he had the potential to make up for billings lost during his Gateway hours. Franco took the position that he would be seeing patients somewhere in any event, so this was no compensation at all.

All this led to a meeting on January 4, 2000, among the GPS principals and Dr. Franco. The meeting had initially been called by Franco to discuss his bonus. According to the minutes of the January 4 meeting (PX 15), that item was discussed, and Dr. Franco was told that his earning did not qualify him for his contractual bonus (although he got a $2000 check—a Christmas gift or tip—at the end of 1999). According to an analysis presented at the meeting, Franco averaged $20,000 per month less in billings, and 25 fewer patients each month, than did the partners in GPS. He also coded fewer of his patients at the highest levels for Medicare and insurance company reimbursement and ordered fewer ancillary tests.[2] This discussion was held in an atmosphere of some mistrust. Between Christmas and New Year's 1999, Franco had gone to the independent office that handled GPS's billings and demanded to see billing reports for himself and the shareholders of each indi-

---

2. The Court cannot help but note that GPS's emphasis on such matters as high coding and the ordering of ancillary tests feeds into every patient's—and insurer's—fear that physicians are ordering unnecessary tests and overdiagnosing in the hope of obtaining greater reimbursement.

vidual doctor in the practice. He falsely advised the billing coordinator that Dr. DiCosmo had authorized his receipt of those reports, a defalcation for which he was reprimanded. (PX 14.)

Although it had not been called for this purpose, GPS took the opportunity of the meeting to discuss what it viewed as Franco's performance problems. The doctors reviewed a number of criticisms of his performance, including his tardiness and patient cancellations, excessive phone time,[3] Gateway participation, Franco's lack of participation in what were referred to as "extracurricular activities" (and what Dr. DiCosmo testified were practice-building marketing opportunities), the fact that the loan remained unpaid, and above all the need to "optimize Greenwich practice—get us on staff to cover" and "optimize sleep-develop program w NYH of Greenwich or other, obtain boards." (PX 15.) This last entry referred to what had been one of Franco's attractions for GPS: his knowledge of sleep medicine and his eligibility to sit for board certification in that area. Dr. Franco had not sat for the Boards or developed a sleep medicine program during his first 18 months with the practice.

According to the testimony of Dr. Di-Cosmo, as corroborated by a number of memos to the file, the situation with Franco did not improve over the first four months of this year. Several memos attest to his continuing problem with lateness, although the Court finds that this was exacerbated by GPS's impossible scheduling practices. Others state that Franco missed meetings with outside physicians or inexplicably canceled patient appointments. (PX 16–25.) Franco testified that at least some of the absences were authorized, and that he failed to make a meeting about the sleep medicine endeavor because he was not told of the meeting until the night before—too late to cancel the next day's rounds at GH. I find this

testimony credible. However, GPS began docking Franco's pay for each instance of tardiness pursuant to a new office policy that was instituted at or about the time GPS began complaining to Franco about the issue.

The issue of the bonus did not go away, either. On March 31, 2000, someone prepared a schedule of all of Franco's collections during 1999, to establish that he had truly failed to meet his $350,000 minimum. (DX 36.) There is a question mark and a blank next to the word "Greenwich," which is not surprising, because GPS had not received any money in respect of Dr. Franco's services at GH since August 1999. Prior to that time, Dr. Franco had been paid monthly by GH and had endorsed the check over to GPS. This practice ceased in mid–1999, for reasons that have not been satisfactorily explained by either side. Whatever the reason, the practice was not seeing income from this particular activity of Dr. Franco, which added to the general sense of ill will. Eventually, Dr. DiCosmo sent a bill to GH for all unpaid activity in 1999. (DX 39.)

At some point during the late winter/early spring, Franco began exploring the possibility of increasing his teaching hours at GH. Franco testified that he had at least two conversations about whether additional hours were available. He also testified that he was exploring the possibility of extra teaching hours to obtain additional income so that he could reach his bonus target during the year 2000. I do not find that explanation credible, as every hour Dr. Franco spent teaching at GH was an hour he could not devote to seeing patients at GPS's offices.

The crescendoing situation reached its climax on April 28, 2000, a Friday. Early that morning, the Mamaroneck office of GPS was served with a summons and complaint in an action brought by Dr. Franco in the Superior Court of Fairfield County,

---

**3.** There is no evidence in this record that Dr. Franco spent an inordinate amount of time on the telephone on personal matters. He did call his pregnant wife several times during the day, a practice of which this Court highly approves.

Connecticut. In that lawsuit, Dr. Franco sought, *inter alia,* payment of a contractual bonus, profit sharing proceeds and life insurance benefits. He also sought to invalidate the restrictive covenant, on the ground that it was unenforceable. Additionally, he accused GPS of several counts of fraud in the inducement of the contract and civil conspiracy in falsely attributing to him failure to perform an EKG on a patient, for which he had been disciplined by a peer review committee consisting of Plaintiff's shareholders, Dr. DiCosmo, and Dr. Gismondi.

Dr. Franco went to work in a satellite office following his stint at GH on the day he filed his lawsuit. The following day, Saturday, he went into the Mamaroneck office. He was questioned about the lawsuit by the office manager and by other staffers. No one who was present at that conversation testified about what was said except Dr. Franco. Therefore, unless I credit Dr. Franco's version, I have no evidence concerning what was actually said. However, I do not credit Dr. Franco's testimony on this point. I do credit Dr. DiCosmo's testimony that he and his partners were told by staffers that Franco planned to leave to pursue another opportunity. I do not accept this as proving that Dr. Franco actually said what was attributed to him. I do accept it to prove that this statement (true or false) was conveyed to the shareholders, and to prove what was in GPS's mind the following Monday, May 1.

On May 1, Dr. Franco reported to work after leaving GH. Dr. Sherling came into his office and fired him, saying that the events of the past three days had made it impossible for them to work together any more. Dr. Franco gathered his belongings, turned in his keys, pager and billing cards, and left the premises. He returned immediately to GH, where he began to work. Within a week, he issued a bill to GH for $500 for "administrative services" rendered between May 1 and May 5. (PX 55.) He issued another bill two weeks

later. (PX 57.) Both invoices were issued on an office invoice form legended:

Michael J. Franco, M.D.
1011 High Ridge Road
Stamford, CT 06905
203–863–3000

Given that the first of these invoices was dated May 6, 2000, and that the invoice forms were pre-printed and contained both an address (in a building owned by GH) and a telephone number (which ordinarily takes a few days to obtain), it seems apparent that Dr. Franco had made arrangements to set up his office in Stamford prior to his being fired from GPS on May 1. This is consistent with his having begun negotiations for more hours at GH in March or April and his filing a lawsuit on April 28 containing scandalous allegations of fraud and conspiracy in order to invalidate his restrictive covenant. I do not credit Dr. Franco's testimony that he did not locate his office until a week to ten days after he was fired.

Dr. Franco did not come into his new office empty-handed. He brought with him copies of the employment contracts of all the other doctors at GPS—documents to which he should never have had access, and could only have obtained in violation of the duty of loyalty owed by every employee to his employer—as well as daily logs of patients seen by Dr. Franco every day that he had worked in the practice since 1997. GPS makes a great deal of the fact that Dr. Franco obtained and kept these documents, but I credit Dr. Franco's testimony that he took his schedule every morning, made notes on it and never gave it back. If GPS found this process irregular, it should have ordered Franco to start giving his schedules back long ago. However, that does not mean that Dr. Franco had any right under his contract to remove those schedules from GPS's premises.

Dr. Franco has received communications from patients he saw while affiliated with GPS since his departure from the practice. He gave follow-up treatment to one of those patients, Willie Ellis, whom he had

been seeing at GH, at no charge. He was called by at least three other patients, but there is no evidence that he has seen any other GPS patients or that he has engaged in any wholesale raiding of those patients. He has not yet attempted to communicate with GPS's patients, although he testified that he hoped to send a letter, worked out jointly with GH, to explain the circumstances of his departure. Frankly, I find that testimony ludicrous.

On May 25, 2000, GH cut a check in response to the invoice sent by GPS with respect to Franco's services during the last half of 1999. As with all other GH checks, it was made out to Franco. Franco turned the check, uncashed, over to his counsel. (PX 52.) The check was first tendered to GPS in open court during the trial, despite the fact that it was indisputably owed to the practice.

GH is now paying Dr. Franco at the rate of $60,000 per annum to serve as a part-time member of its faculty, which is more than double the rate it paid him for two hours' teaching per day. Dr. Franco treats patients at GH as part of his teaching position at GH; indeed, he testified that as a teacher, "you are involved with treating patients and directing their care." Dr. Franco also covers for Dr. Marino on weekends at the hospital, which involves seeing Dr. Marino's patients. Dr. Franco also retains his admitting privileges at GH, and GH is the only hospital in Connecticut where Dr. Franco is presently able to admit his patients.

The two GPS doctors who are Connecticut residents and who hold Connecticut licenses to practice medicine plan to apply for admitting privileges at GH.

### (2) *Procedural History*

As noted above, Defendant filed the first action in Fairfield County Superior Court. That action was removed by GPS (the defendant therein) to the United States District Court for the District of Connecticut on May 12, 2000. A motion was made to stay this action in favor of the Connecti-

cut action or to transfer this case to Connecticut; this Court denied that motion by oral order on May 23, 2000.

In papers filed in the Connecticut action on a motion to dismiss that action, GPS represented to the Court that it did not do or transact business in Connecticut; that it was not registered with the Secretary of State of Connecticut to transact business in that State, that it maintained no office in Connecticut, that it did not advertise in Connecticut, and that it otherwise did not satisfy the minimum contacts with Connecticut so as to subject it to jurisdiction in that state under *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). GPS took the position that having an employee on the teaching staff of GH, who worked in Connecticut on its behalf five days a week for two and one half years, and whose remuneration, while nominally paid to Franco, belonged to GPS, did not constitute "transacting business" within the State of Connecticut.

### (3) *Conclusions of Ultimate Fact*

Based on the credible evidence adduced at trial, I conclude that:

1. Michael J. Franco, the Defendant, orchestrated his termination from GPS by creating a situation in which it would have been all but impossible for the practice to retain him as an employee in the hope of precipitating his firing—in which hope he was successful.

2. Michael J. Franco, the Defendant, made arrangements to set himself up as a part-time faculty member at GH, at significantly increased remuneration, and to maintain an office in a GH-owned facility in Stamford, CT, prior to his departure from his employment at GPS.

3. Michael J. Franco, the Defendant, is in default on the promissory note, PX 2.

### CONCLUSIONS OF LAW

■ Covenants not to compete after termination of employment "will generally be

enforced against medical and dental professionals if such covenants are reasonably limited temporally and geographically and, without being harmful to the public or unduly burdensome, serve the acceptable purpose of protecting the former employer or associate from unfair competition." *Rifkinson–Mann v. Kasoff,* 226 A.D.2d 517, 641 N.Y.S.2d 102, 103 (1996) (citation omitted). *See also Novendstern v. Mt. Kisco Medical Group,* 177 A.D.2d 623, 576 N.Y.S.2d 329, 330 (1991), *leave to appeal dismissed,* 80 N.Y.2d 826, 587 N.Y.S.2d 908, 600 N.E.2d 635 (1992) (noting that "[i]t is settled that covenants restricting a physician from competing with a former employer or associate" are enforceable subject to above conditions). In light of these controlling principles, there are three legal issues that need to be resolved in this matter.

First, does the phrase "practice of medicine" as used in Section 10 of PX 1 encompass either (1) serving as a faculty member in a teaching hospital, or (2) admitting patients to GH when those patient relationships were cultivated out of a medical practice located in Stamford?

Second, was the defendant terminated "for cause" so as to trigger the exception to the usual rule that covenants not to compete are not enforceable absent the continued willingness of the employer to employ him?

Third, assuming that the answers to the first and second questions do not knock plaintiffs out of the box, is the covenant in this case reasonable in time, place and scope? In particular, as Defendant has framed the question during summations, does GPS have a protectable interest in preventing plaintiff from practicing medicine in Greenwich, where it does not presently have any offices or admitting privileges (although it has several hundred patients from the Greenwich area)?

### (1) Scope of "Practice of Medicine" Pursuant to the Non–Compete Agreement

Defendant first contends that the phrase "practice of medicine" under the agreement is ambiguous, because he understood that term to include only establishment of an office location, not the exercise of privileges at Greenwich Hospital. He therefore asks me to apply the doctrine of *contra proferentem* to construe the term against Plaintiff and in his favor.

■ I reject this argument, and find that "the practice of medicine" is not an ambiguous term. Under New York contract law, an unambiguous term "should simply be given its plain and ordinary meaning." *Rosalie Estates, Inc. v. Colonia Ins. Co.,* 227 A.D.2d 335, 643 N.Y.S.2d 59, 61 (1996). Webster's II New Riverside Dictionary (3d ed.1994) defines "practice" as "4. The exercise of an occupation or profession," and "medicine" as "1.a. The science of diagnosing, treating, or preventing disease or damage to the body and mind. b. The branch of this science encompassing nonsurgical management of disease or physical and mental impairment by drugs, diet, and exercise." Dr. Franco's employment at Greenwich Hospital plainly falls within these parameters. In his affidavit, he describes his duties at GH as "provid[ing] intensive care teaching rounds," which he testified includes "treating patients and directing their care." Obviously, this encompasses diagnosing and treating patients and managing their illnesses. I therefore find that Dr. Franco's work at GH constitutes the practice of medicine within the meaning of the covenant not to compete.

### (2) Enforcement of the Non–Compete Covenant Is Not Barred by Defendant's Discharge

■ Defendant argues that, because he was terminated from employment, the non-compete clause may not be enforced against him. Under New York law, an employer may not enforce a non-compete

clause against an employee whose termination was "involuntary and without cause." *See Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 48 N.Y.2d 84, 88, 421 N.Y.S.2d 847, 397 N.E.2d 358 (N.Y. 1979).

I conclude that Dr. Franco was terminated for cause. Section 9(g) of his employment agreement with GPS provides as a ground for termination "[a] determination by the CORPORATION that EMPLOYEE has engaged in misconduct or has breached this Agreement in such a material manner as to render continuance as an EMPLOYEE detrimental to the CORPORATION." Here, Dr. Franco failed to turn over payments from Greenwich Hospital to GPS from August 1999; failed to promote the practice or to cooperate in developing new areas for the practice (i.e., sleep medicine); misappropriated GPS patient billing records, started negotiations for increased hours at GH while he was still employed at GPS and, also while still in Plaintiff's employ, made extensive preparations to leave GPS (including finding an office and printing stationery); and then maneuvered his employer into firing him by making scandalous allegations in the Connecticut suit, including allegations of fraud. One of those allegations, failure to pay a bonus, was clearly baseless, given Defendant's own testimony at trial that he was not eligible for incentive payments in 1999. Viewed together, these facts point to the conclusion that Dr. Franco purposely engaged in a course of conduct that was designed to induce GPS to fire him, in the hope of relying on *Post* to render the non-compete clause unenforceable.

Moreover, I find that Dr. Franco's attempt to have a court declare the non-compete clause invalid before he left GPS violated his duty of good faith and fair dealing, which is an implied term of every contract under New York law. *See Page Mill Asset Mgmt. v. Credit Suisse First Boston Corp.,* No. 98 Civ. 6907, 2000 WL 335557, *8 (S.D.N.Y. Mar.30, 2000) (citation omitted). The restrictive covenant

was plainly a material term of his employment agreement. Indeed, I credit the testimony of Dr. Paglia that there would have been no agreement without it.

Defendant's actions up to his termination clearly amounted to misconduct and a breach of the agreement "in such a material manner" as to make his continued employment detrimental to GPS.

Defendant contends that a non-compete covenant is unenforceable against a terminated employee, regardless of whether the termination was for cause or without cause, citing *Handel v. Nisselson,* No. 98 Civ. 6662, 1998 WL 889041 (S.D.N.Y. Dec.18, 1998). This argument, however, is not supported by the New York Court of Appeals' holding in *Post.*

In *Post,* the plaintiffs were terminated by their employer without cause following the vesting of their pension rights. A non-compete clause in their employment contracts provided that those pension rights would be terminated in the event that the employee directly or indirectly competed with the employer. The *Post* Court held this provision unenforceable, reasoning as follows:

> Acknowledging the tension between the freedom of individuals to contract, and the reluctance to see one barter away his freedom, the State enforces limited restraints on an employee's employment mobility where a mutuality of obligation is freely bargained for by the parties. An essential aspect of that relationship, however, is the employer's continued willingness to employ the party covenanting not to compete. Where the employer terminates the employment relationship *without cause,* however, his action necessarily destroys the mutuality of obligation on which the covenant rests as well as the employer's ability to impose a forfeiture. An employer "should not be permitted to use offensively an anticompetition clause coupled with a forfeiture provision to economically cripple a former employee and si-

multaneously deny other potential employers his services."

Post, 48 N.Y.2d at 89, 421 N.Y.S.2d 847, 397 N.E.2d 358 (emphasis added). The Court concluded that "[u]nder the circumstances of the case at bar it would be unconscionable to tolerate a forfeiture, precipitated as it is by the unwarranted action of the employer." Id.

In Handel, the case upon which Defendant relies, the defendants were terminated due to their employer's financial difficulties, a reason that the Court found not to constitute "cause" under New York law. On that ground, the Court held the defendants' non-compete agreements unenforceable. The Handel Court went on, however, to reject the plaintiff's argument that "even if appellant could be deemed to have been terminated for cause, plaintiff-appellee may still enforce the non-competition clause." Apparently focusing exclusively on a single sentence from the Post Court's opinion quoted above, the Handel Court concluded that "in enforcing a non-competition covenant, a court must first find that the employer was willing to continue providing employment to the employee." Handel, 1998 WL 889041 at *3. The Handel Court's observation, which, of course, is merely dicta, is not consistent with the language or the rationale of the New York Court of Appeals in Post.

The decision in Post was grounded on the unfairness of enforcing a non-compete clause where an employer unilaterally nullifies the parties' contractual bargain by terminating the employee without cause, rather than the employer's general unwillingness to continue the employment. Obviously, whenever an employee is discharged, whether with or without cause, the employer is "unwilling" to continue the employment relationship. Post, however, is addressed specifically to those cases where employees against whom non-compete covenants are sought to be enforced have done nothing to bring about their discharge. Here, by contrast, as detailed above, Dr. Franco maneuvered his employer into terminating him so he could wiggle out from under the covenant not to compete. This case is thus a far cry from the facts of Post, in which the employees were wholly passive actors who were utterly powerless to avoid termination "precipitated by the unwarranted action" of their employer. Moreover, to accept Defendant's argument would permit employees to avoid reasonable non-compete agreements simply by "creating" cause for their dismissal, in breach of their duty of good faith and fair dealing, such as Defendant did in this case. Nothing in Post can be read to support such a result. I therefore conclude that the termination of Dr. Franco for cause does not preclude enforcement of the non-compete agreement against him.

### (3) Plaintiff Has a Protectable Interest in Connecticut

Finally, Defendant argues that the geographic scope of the non-compete clause is unreasonable insofar as it includes Greenwich Hospital, because GPS has no protectable business interest in the State of Connecticut. I disagree.

Defendant first suggests that Plaintiff's lack of an interest in Connecticut is evidenced by the lack of minimum contacts sufficient for exercise of personal jurisdiction under International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). To satisfy due process requirements under that standard, a party must have "sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction." Metropolitan Life Ins. Co. v. Robertson–Ceco Corp., 84 F.3d 560, 567 (2d Cir.), cert. denied, 519 U.S. 1006, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996). Defendant makes much of the fact that GPS is not registered to transact business in Connecticut and that none of the doctors at GPS, save Defendant, applied for privileges at Greenwich Hospital. He also notes that GPS argued to a Connecticut court that it did no business in Connecticut.

■ However much I deplore Plaintiff's choice of litigation strategy, I find that the practice of medicine by Dr. Franco at Greenwich Hospital while employed by GPS, for which GPS was paid $26,000 per year, constitutes an adequate contact with the State of Connecticut for constitutional purposes. (In this regard, I note that the eastern Westchester/lower Fairfield County area is divided by an extremely porous border and is a single community for all practical purposes, so that the state line is largely irrelevant as a practical matter.)

■ Defendant next contends that, regardless of the constitutional import of GPS' activity in Connecticut, the business interests of GPS in that state were too minimal for the non-compete clause to pass muster under New York law or for a finding of irreparable harm to support an injunction against him. I do not accept this characterization. I credit Dr. DiCosmo's testimony that GPS' short-term business plan included expansion into Fairfield County, Connecticut, and that Dr. Franco's employment at GPS was the first step in carrying out that plan. Indeed, it is disingenuous (to say the least) for Dr. Franco to suggest that Plaintiff has no interest in Connecticut, when he was the concrete manifestation of that interest. In view of the fact that Dr. Franco has received several communications from patients he saw while affiliated with GPS, that he gave follow-up treatment to one of those patients (albeit at no charge) at Greenwich Hospital, and that GPS currently has several hundred patients in the Greenwich area, Dr. Franco's work at GH already poses a threat to GPS' present and future interest in going forward with its planned expansion.

Furthermore, in the employment agreement, an exception was carved out for Stamford, where there exists a reputable hospital—the very one at which Defendant performed his internship and residency—to which he can admit his patients. Defendant has offered no evidence to suggest that Stamford Hospital is any less capable of serving his patients than is Greenwich Hospital. He does suggest that GH, by virtue of its location in the tonier community of Greenwich, has a superior cachet with the patients he hopes to attract. However, Dr. Franco freely bargained away his right to practice in Greenwich for the next three years. Having secured himself the ability to earn his living in his home state, he cannot now be heard to complain. I therefore conclude that the covenant is reasonable in geographic scope and duration.

In this respect, *Novendstern,* 576 N.Y.S.2d 329, which Plaintiff cites, is instructive. In that case, the Appellate Division enforced a non-compete covenant against the plaintiff, a physician, barring him from engaging in the practice of medical specialties, obstetrics and gynecology within a specified area of northeastern Westchester County for three years from the termination of his employment. Although, as Defendant points out, the *Novendstern* Court took into account the fact that the defendant's practice had been in existence since 1947, in contrast to the relatively recent expansion of GPS into the Greenwich area, the Court went on to observe that "the medical group developed and prospered as a result of the considerable time, money and efforts of its members." *Id.* at 625, 576 N.Y.S.2d 329. Nothing in the case law lends support to Defendant's suggestion that an employer's interest with respect to a non-compete clause must exist for several decades before it is deemed protectable. As I have concluded, Plaintiff in this case also expended considerable time, money and efforts to develop its practice in Connecticut through the services of Dr. Franco. I therefore find *Novendstern* to be apposite to the facts before me.

Finally, I reject Defendant's assertion that enforcement of the covenant would be detrimental to the public interest by restricting physicians from referring patients to Dr. Franco according to their discretion. The prospect of such harm is minuscule in

view of the abundant physician-specialists in the populous Greenwich area, and the fact that patients may still be treated by Defendant at nearby hospitals other than GH if Defendant obtains privileges at those hospitals (and there is no reason to believe that he will not).

### (4) *Liquidated Damages*

■ Plaintiff also seeks an award of liquidated damages in the amount of $130,000 plus interest, reasonable attorneys' fees, and costs, as provided under the non-compete agreement. Because I am granting Plaintiff a permanent injunction, I conclude that an award of liquidated damages would be so disproportionate to Plaintiff's loss as to amount to an unenforceable penalty. *See Novendstern*, at 625, 576 N.Y.S.2d 329 (denying liquidated damages award of one year's gross medical fees where permanent injunction granted).

### (5) *Defendant's Promissory Note*

There being no dispute that Dr. Franco owes GPS the unpaid balance on his loan in the amount of $11,375, Plaintiff is awarded that sum.

### *Conclusion*

For the above reasons, (1) Plaintiff's request for a permanent injunction enforcing the non-compete clause in its employment agreement with Defendant is granted; (2) Plaintiff's application for an award of liquidated damages is denied; and (3) Plaintiff shall have judgment for the outstanding balance of its loan to Defendant, plus interest computed from the date of each installment at the statutory rate.